IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BLANCHE MORRO,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>DGMB CASINO LLC d/b/a RESORTS<br>CASINO HOTEL, ABC JOHN and/or<br>JANE DOES, XYZ<br>CORPORATION(S)/LEGAL ENTITIES<br><br>　　　　　　Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 13-cv-5530 (JBS/JS)<br><br>**OPINION** |

APPEARANCES:

Michelle J. Douglass, Esq.
MY RIGHTS LAWYERS EMPLOYMENT LAW GROUP, LLC
424 Bethel Road
Somers Point, NJ 08244
　　　Attorney for Plaintiff

Russell L. Lichtenstein, Esq.
Stephanie Farrell, Esq.
COOPER, LEVENSON, PA
1125 Atlantic Avenue
Third Floor
Atlantic City, NJ 08401-4891
　　　Attorneys for Defendant DGMB Casino, LLC

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

Plaintiff Blanche Morro was hired by Defendant Resorts

Casino Hotel in December 2010 as a "singing bartender" in the 25

Hours Bar inside Resorts Casino. Her job was to sing while

simultaneously taking drink orders from patrons, mixing drinks,

and making change. In 2012, Resorts Casino came under new management and underwent a strategic rebranding, which also included an overhaul of the casino's entertainment offerings. On June 1, 2013, while these changes to the casino's image were being implemented, Defendant eliminated the position of "singing bartender" and demoted Plaintiff to a regular bartender. Plaintiff was ultimately fired as a regular bartender on September 2, 2014.

In the two months before her position was terminated, Morro had filed a union grievance contesting her pay rate and had registered a complaint about the unsafe working conditions at the casino. She was also out on medical leave when her position was eliminated. After her position was eliminated, she filed a claim for worker's compensation. Plaintiff asserts that her termination was related to these actions.

Specifically, Plaintiff alleges that she was terminated for taking protected leave, in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. 2601 *et seq*. She also alleges that she was terminated in retaliation for filing a complaint with the Occupational Safety and Health Administration ("OSHA") about her workplace, for filing a union grievance, and for filing a worker's compensation claim, in violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1

2

*et seq*. She argues that the elimination of her position violated her employment contract with Defendant, which was part of the collective bargaining agreement between Defendant and Plaintiff's union.

Defendant argues that the elimination of the "singing bartender" position was a strategic decision and was part of Defendant's plans to update the look and feel of the bar in which Plaintiff worked.

Presently before this Court is Plaintiff's motion to exclude as evidence a letter by OSHA dismissing Plaintiff's claim of retaliation. Defendant has filed a motion for summary judgment on all claims, which Plaintiff opposes. Plaintiff also seeks partial summary judgment and asks this Court to find that Defendant is not entitled as a matter of law to assert a "legitimate business reason" for Plaintiff's termination because her termination violated the contractual agreement between Defendant and Plaintiff's union. For the reasons below, the Court will grant Plaintiff's motion to exclude the OSHA letter and deny Plaintiff's motion for partial summary judgment. Defendant's motion for summary judgment will be granted.

## II.  BACKGROUND

### A. Summary Judgment Record

1. <u>Plaintiff's Union Grievance</u>

3

Morro was a member of the collective bargaining unit at Resorts Casino, the Food and Beverage Workers Union, UNITE-HERE, Local 54. Her bartender position was the only one designated as a position which required singing skills (the "singing bid"). Under the Memorandum of Agreement ("MOU") executed between the Union and Defendant, Plaintiff was paid $21.63 per hour. (Morro Cert. ¶¶ 9-12.)

In December 2012, the union entered into a new collective bargaining agreement ("CBA") with Defendant. The CBA was effective from December 21, 2012 to September 14, 2014. A Memorandum of Agreement ("MOA") was also executed regarding the "singing bartender" position, which was incorporated as Side Agreement 12, an Attachment to the CBA. (CBA, Attachment 12, Ex. 7 to Morro Cert. [Docket Item 34-7].) Attachment 12 states,

> The Employer shall be permitted to designate a total of one (1) Bartender bid that shall be considered a bid that requires singing skills ("singing bid.") . . . . The Bartender who currently occupies the singing bid, 'Blanche Travis-Morro' shall remain in such bid and can not be bumped. This agreement shall expire upon Blanche's separation from the company.

(Id.)

Article 3 of the CBA provides that Defendant "reserves the right . . . to recruit, hire, reclassify, retain, schedule, assign, promote, transfer, layoff/recall, discipline, discharge, or rehire according to the requirements of business . . . ."

4

(CBA, Art. 3.) Article 22, Section 22.1 of the CBA states, "This contract shall supersede any other contract in effect between the Employer and the Union and any prior or pre-existing contract . . . ." (Id. Art. 22.) Attachment 7 to the CBA states that Attachments to the CBA "will not be superseded by Article 22, Section 22.1 . . . ." (Id. Attachment 7.)

The MOU that was negotiated in December 2012 originally stated that Morro would be paid $22.61 per hour, which was 98 cents higher than Plaintiff's hourly wage at the time. When a union representative showed Plaintiff the negotiated MOU, Plaintiff noticed that there was a difference in pay compared to what she was actually making. She was informed by a union representative that the increased wage was ratified by Defendant.

On or around March 2013, Plaintiff noticed that she was not being paid her increased hourly rate and brought the issue up with the Vice President of Human Resources, Greg Wackenheim. In April, Wackenheim wrote an email to a union representative, "If we owe Blanche wages we would pay them. We don't need a grievance. Just let me know the dates and hours we did not pay, I will research it and we will make her whole if we made a mistake." (April 5, 2013 Email, Ex. L to Farrell Cert. [Docket Item 31-18].) In an email exchange dated March 4, 2013,

5

Wackenheim wrote to union's Financial Secretary Treasurer, Donna DeCaprio, that it "seem[ed] to me that we made an error. I do not remember talking about a raise for Blanche. What do you recollect?" (Mar 4, 2013 Emails, Ex. F to Farrell Cert. [Docket Item 31-12].) DeCaprio wrote back, "No, we did not talk about giving Blanch[sic] a raise. If you reference the side agreement, we indicated her wage rate [at] $22.51." (Id.) Wackenheim responded, "She makes 21.6346. What must have happened is that the 22.61 was used and I didn't check to see if that was the rate." He then wrote, "Since this was a mutual mistake, I propose we amend the side agreement and move forward with Blanche at her current rate." DeCaprio agreed. (Id.)

Wackenheim told Plaintiff that Defendant had made an honest mistake in the MOU and that it had not intended to raise her hourly pay. (Morro Cert. ¶ 86, 92.) Plaintiff was also informed that DeCaprio believed that the pay increase had been a typographical error. (Morro Cert. ¶ 89; SMF ¶ 40.)

Plaintiff's pay rate in the MOU was amended. The $22.61 was crossed out by hand and replaced with $21.63, with DeCaprio's initials (Morro Cert. ¶ 93; MOU, Ex. 3 to Morro Cert. [Docket Item 34-7].)

Plaintiff prepared a Step 1(a) grievance form to dispute her pay rate, but union representatives told her that the

6

grievance would not be decided in her favor if she chose to go forward. (Morro Cert. ¶¶ 95, 98.) During a pre-grievance meeting with a union representative, Patty Burke, Burke told Plaintiff that the union and Defendant were in agreement that Plaintiff would not be entitled to the increase in pay to $22.61 because that amount was a typo. (Morro Dep. [Docket Item 34-9] 78:15-21.)

Plaintiff nevertheless filed a formal grievance on April 5, 2013 (Morro Cert. ¶ 100; Grievance Notice, Ex. J to Farrell Dep. [Docket Item 31-16].) The grievance was put on hold when Plaintiff went out on medical leave on April 26, 2013.

2. The rebranding of Resorts Casino

In a certification from Mary Tindall, the Vice President of Marketing at Resorts Casino responsible for overseeing and approving entertainment at the casino, Tindall asserts that the elimination of Plaintiff's "singing bartender" position was part of the strategic rebranding of Resorts Casino. (Tindall Cert. [Docket Item 31-5] ¶¶ 3-4; Counterstatement of Material Facts ("CMF") ¶ 26.) Tindall states that Defendant was in discussions regarding changes to the branding of the property and its entertainment offerings since October 2012. (Id. ¶ 8.) She noted that in or about July 2013, the 25 Hours Bar was given an "aesthetic overhaul" and changed its name to Bar One. The

7

entertainment in Bar One "transitioned to disc jockeys and small live acts, . . . as opposed to the 4-5 piece bands that previously performed in the 25 Hours Bar." As part of those changes, disc jockeys were added to the entertainment in March 2013, Plaintiff's "singing bartender" position was eliminated in June 2013, and live band entertainment was eliminated from the bar in August 2013. (Id. at ¶ 6.)[1]

Plaintiff was aware of discussions to rebrand the casino and restyle the 25 Hours Bar as Bar One, but asserts that her "singing bartender" position was being incorporated into the casino's new entertainment offerings. She notes that even under new management, Defendant continued to promote Plaintiff through advertisements through the end of 2012 and into March of 2013. (Morro Cert. ¶¶ 40, 74; see Feb. 21, 2013 advertisement, Ex. 8 to Morro Cert. [Docket Item 34-7]; Mar. 1, 2013 advertisement,

---

[1] Tindall asserts that other changes to the entertainment were made as part of the rebranding, such as the elimination of a violinist position in March 2013 and a pianist position in June 2012. In addition, Defendant eliminated two entertainment spots, The Whisky Bar in November of December of 2012, and The Pro Bar in November 2013. Defendant also eliminated a "Divas show" in September 2013. (Tindall Cert. ¶ 6.) In her certification, Morro states that some of the other entertainment acts had been publicly slotted for elimination. She states that she knew the pianist was going to be cancelled and that the stilt walker was just a temporary act. (Morro Cert. ¶ 66.) She also asserts that none of the terminated individuals mentioned by Tindall were union employees and none had a contract or bid. (Morro Cert. ¶ 67.)

8

Ex. 11 to Morro Cert. [Docket Item 34-7].) Sometime around March 2013, Morro had several meetings with Mary Tindall on updating the drink menu and the look and feel of the 25 Hours Bar, and was trained in mixing new cocktails. (Morro Cert. [Docket Item 34-6] ¶ 76.) Plaintiff also incorporated updated genres of music into her performance in order to blend with the new vibe of the bar. (Morro Cert. ¶¶ 76-77.)

In February 2012, Plaintiff met with one of Defendant's investors, Joe Jerome. Jerome told Plaintiff that she was a valued asset and needn't worry about job security. (Morro Cert. ¶¶ 33-34.) In a meeting with Senior Vice President and Chief Financial Officer Gary Van Hettinga in September 2012, Van Hettinga told Plaintiff that there would be no staff changes and that Plaintiff was doing a great job. He also stated that there were eventual plans to remodel the 25 Hours Bar but told Plaintiff to "keep that 'Blanche smile on' and continue to do the fabulous job 'you always do.'" (Morro Cert. ¶ 39; Morro Dep. 167:17-24.) Plaintiff also asserts that when the new President and CEO of Resorts Casino visited the 25 Hours Bar in early 2013, he told Plaintiff that she was one of the people he was happy to incorporate into the casino's planned changes. (Morro Cert. ¶ 51.)[2]

---

[2] Defendant argues that these statements are inadmissible hearsay.

3. Plaintiff's FMLA leave and the elimination of the "singing bartender" position

Beginning in or around December 2012, Defendant began a series of construction projects on the first floor of the casino, where the 25 Hours Bar was located, to update the look of the casino. The renovations required construction crews to use jackhammers and rip up old carpeting, releasing dust and particles into the air.

Plaintiff complained to the Food and Beverage Office regularly about the manner in which the construction was taking place and complained that Defendant was not providing a sufficient barrier to shield employees from the dust and noise of the construction. She also complained to her supervisors about how sick the conditions made her feel. (Morro Cert. ¶¶ 105, 108.) Plaintiff missed three days of work in January and February of 2013 due to throat and lung issues she attributes to the dust and debris from the construction. (Morro Cert. ¶ 109; doctor's notes; Ex. 14 to Morro Cert. [Docket Item 34-7].) She

---

Hearsay statements may be considered on a motion for summary judgment if they are capable of admission at trial. Shelton v. Univ. of Medicine & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000). As it is conceivable that these witnesses could testify at trial, and the statements could qualify as an admission by a party opponent under Rule 801(d)(2)(A), Fed. R. Ev., the Court will accept Plaintiff's statements for purposes of this summary judgment motion. A statement by an officer of a corporate defendant regarding matters within the scope of duties of the officer is non-hearsay under Rule 801(d)(2)(D).

began having throat problems and developed symptoms of an asthma attack. (Morro Cert. ¶¶ 121-127.) She was diagnosed with post nasal drip and sinus and allergic rhinitis and was prescribed antibiotics and cough syrup with codeine. (Morro Cert. ¶ 126.)

Morro's symptoms continued to get worse. On April 27th, she sent an email to several managers saying that she would be taking a day of FMLA leave because she had "a severe allergic reaction, that went into an asthma attack." One manager, Maureen McCauley, wrote back, "Sorry to hear this. Barb just sent an eMail. I bet it's the carpet. Who knows what's been unearthed in the process!" (April 27, 2013 Email, Ex. 16 to Morro Cert. [Docket Item 34-7].)

Plaintiff did not return to work after that day and remained on leave until her termination in August 2014. Shortly after she went out on medical leave, Defendant granted Plaintiff leave under the FMLA from April 26 through June 4, 2013. (May 10, 2013 Letter, Ex. C to Farrell Cert. [Docket Item 31-9].) Defendant admits that Plaintiff did not exhaust her leave under the FMLA until July 19, 2013. (Hulsizer Cert. [Docket Item 31-4] ¶ 4.)

At around the time Plaintiff sought approval for FMLA leave, she filled out a form for temporary disability benefits, which Defendant signed on May 10, 2013. (Medical Form, Ex. 17 to

Morro Cert. [Docket Item 34-7].) On the form, Plaintiff checked
"No" to Question 7a, "Did the claimant's disability happen in
connection with his/her work or while on your premises, or was
the disability due in any way to his/her occupation?" (Id.)
Plaintiff submitted a second claim for temporary disability
benefits, which Defendant completed on June 4, 2013.

Morro's position was eliminated while she was out on
approved FMLA leave. In a letter dated June 1, 2013 and signed
by the Food and Beverage Director, Renee Fleifel, Defendant
informed Plaintiff that it was eliminating the "singing
bartender" bid "[d]ue to a change in our Marketing strategy."
The letter further stated that Plaintiff would maintain her
seniority as a bartender and could exercise a bid as a bartender
in the upcoming rebid process if she chose to remain at Resorts.
(June 1, 2013 Letter, Ex. D to Farrell Cert. [Docket Item 31-
10].) As a regular bartender, Morro's pay rate would drop to
$10.47 per hour. (Morro Cert. ¶ 173.)

A copy of the letter was emailed to Local 54
representatives on June 4, 2013. Plaintiff did not grieve the
termination of her position with her union.

Defendant has not reinstated or replaced the "singing
bartender" position since it has been eliminated. (Tindall Cert.
[Docket Item 31-5] ¶ 17.)

4. Plaintiffs' OSHA complaint

In April or May of 2013, around the time Plaintiff went on
FMLA leave, Plaintiff told a manager at the casino, Matt Howard,
that she needed to limit her exposure to toxic fumes and needed
his help. According to Plaintiff, Howard told her that he too
had felt ill but that Resorts Casino did not want anyone to
complain. Plaintiff told him that if Resorts would not protect
her she was going to "take it to legal." (Morro Cert. ¶¶ 130-
135.) She subsequently told four managers at the casino, Matt
Howard, Richard Washington, Ed Hannan, and Maureen McCauley,
that she was going to "go outside Resorts for relief" because
Defendant had failed to address the unsafe working conditions.
(Morro Cert. ¶ 136-37.)

Plaintiff called OSHA to make a formal complaint about
exposure to construction activities on or about April 27, 2013.
OSHA then communicated with Defendant's Risk Manager, Frank
Harrison, regarding Plaintiff's OSHA complaint that employees
were being exposed to dust due to renovation activities.
Harrison did not know the identity of the individual who filed
the complaint. As required, Harrison posted the OSHA complaint
and "Certificate of Posting" outside Defendant's cafeteria. (May
10, 2013 Email, Ex. 19 to Morro Cert. [Docket Item 34-7].)
Harrison spoke with the construction company and interviewed

13

individuals who worked in the area where the construction was being conducted, and none of them complained to him about dust exposure. He did not speak to Plaintiff as part of his investigation. (Harrison Cert. [Docket Item 31-3] ¶¶ 6-7, 11.)

On May 9, 2013, Harrison notified OSHA of the results of his investigation by letter, stating, "Resorts Casino Hotel received no dust complaints from carpet installation, construction or concrete chipping either from guests or employees during the construction project." (May 9, 2013 Letter to OSHA, Ex. 2 to Harrison Cert. [Docket Item 31-3].)

By letter dated June 3, 2013, OSHA informed Plaintiff that OSHA had been advised by Defendant that "the hazards you complained about have been investigated," and consequently, "[w]ith this information, OSHA feels the case can be closed." (June 3, 2013 OSHA Letter, Ex. A to Douglass Cert., Mot. to Exclude [Docket Item 24-5].)

Harrison states that he did not learn the identity of the employee who made the OSHA complaint until June 17th. (Harrison Cert. ¶¶ 9-10.) Harrison also states that he never advised anyone from the Food and Beverage Department or the Marketing Department that Plaintiff had filed an OSHA complaint against Defendant. (Harrison Cert. ¶ 15.)

Plaintiff asserts that while her OSHA complaint was

14

pending, she mentioned to Edward Hannon, the manager and head of
the Technical Services Department, that her medical condition
was caused by conditions at Resorts Casino and that she would
need to get the situation remedied by an outside agency. (Morro
Cert. ¶148-49.) However, she stated that she did not give
Defendant any copies of the letters she filed with OSHA until
after she was terminated. (Morro Dep. 157:1-13.)

Mary Tindall, the Vice President of Marketing at Resorts
Casino, asserts that Plaintiff's filing of an OSHA complaint,
her filing of a Union grievance, and her complaint of illness
due to the casino's construction were not part of the discussion
concerning the elimination of the "singing bartender" position,"
nor did they have any bearing on the actual decision to
eliminate that position. She also asserts that she was not aware
of any of Plaintiff's complaints prior to the termination of
Plaintiff's position as a "singing bartender." (Id. ¶¶ 10-16.)

5. Plaintiff's OSHA complaint of retaliation

On June 13, 2013, shortly after OSHA closed Plaintiff's
complaint alleging unsafe working conditions, Morro filed a
complaint under the anti-retaliation provision of the
Occupational Safety and Health Act (the "Act"), 29 U.S.C. §
660(c), alleging that Defendant terminated her "singing

15

bartender" position in retaliation for her complaint to OSHA.[3]

On June 17, 2013, Harrison wrote an email to Wackenheim, which said,

> Recently there was an OSHA complaint filed by an unknown employee. I answered the complaint based upon information supplied to me by Massett Construction Company (dates they jackhammered) and my own personal investigation. I have now received a copy of a letter between Blanche Morro and OSHA (supplied by Blanche) accusing us of retaliation and discrimination. We did not know she filed an OSHA complaint so her accusations are unfounded.

(June 17, 2013 Email, Ex. B to Farrell Cert. [Docket Item 43-4].)

OSHA dismissed Plaintiff's complaint in a two-page letter dated June 19, 2014, stating that "[f]ollowing an investigation by a duly authorized investigator, the Secretary of Labor . . . finds that there is no reasonable cause to believe that [Defendant] violated Section 11(c)(1) of the Act." (OSHA Letter of Dismissal, Ex. G to Douglass Cert., Mot. to Exclude [Docket Item 24-11].) Regarding Plaintiff's complaint of retaliation,

---

[3] 29 U.S.C. § 660(c)(1) prohibits an employer from discharging or in any manner discriminating against an employee for filing a complaint or instituting or proceeding under the Occupational Safety and Health Act. Section 660(c)(2) allows an employee to file a complaint with the Secretary of Labor alleging a violation of (c)(1) and provides, "Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate. If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person."

OSHA made the following finding:

> Respondent claims the elimination of her position as a singing bartender was a legitimate business decision and had nothing to do with the protected activities. Respondent changed the theme of the area where Complainant work[s], eliminating the singing bartender position and allowing her to bid on another bartending position through the union. Complainant's position would have been eliminated, despite her protected activities.
>
> Respondent has demonstrated by a preponderance of the evidence that Complainant's protected activities were not the motivating factor in the termination and absent the protected activities; they would have taken the same adverse action.
>
> Consequently, the complaint is dismissed.

(Id.) Plaintiff appealed OSHA's determination, but the outcome of that appeal is unclear from Plaintiff's brief.

### 6. Plaintiff's worker's compensation claim and ultimate termination from Resorts Casino

Morro did not return to work after she was demoted to a regular bartender on June 1, 2013. After she exhausted her available leave under the FMLA in July of 2013, Plaintiff used an additional three months of leave under Resorts' Collective Bargaining Agreement. (Hulsizer Cert. [Docket Item 31-4] ¶ 4.) After her leave period expired on October 26, 2013, Plaintiff continued to submit medical documentation and Defendant granted her additional leave requests. (Hulsizer Cert. ¶¶ 6-7.)

Plaintiff asserts that she filed a claim for worker's compensation on October 2, 2013. (Stachninni Cert., Ex. 25 to

Morro Cert. [Docket Item 34-7] ¶ 4.)[4]

Plaintiff continued to be out on medical leave for the next eight months. During this period of time, Plaintiff exercised her bartender bid in several subsequent rebid processes. (Morro Dep. 89:22-90:23.) She was finally approved by her doctor to return to work August 5, 2014. When Defendant received notice that Plaintiff was able to return to work, Defendant informed her that it would be assigning her to work as a regular bartender beginning the week of August 18th. (Aug. 13, 2014 Emails, Ex. 29 to Morro Cert. [Docket Item 34-7].) Morro responded that if Defendant did not have an entertainment position available, she should not be forced to take a position outside of entertaining. (Id.) Morro was subsequently terminated on September 2, 2014 when she failed to call out or show up for her assigned shifts. (Hulsizer Cert. ¶¶ 8-13.)

**B. Procedural History**

Plaintiff's Complaint was removed to this Court on September 17, 2013. In Count One, she alleges that she was fired in retaliation for filing an OSHA complaint, filing a union grievance and filing a worker's compensation claim, in violation of New Jersey's Conscientious Employee Protection Act ("CEPA").

---

[4] Defendant asserts that it was first notified of Plaintiff's worker's compensation claim on or around November 8, 2013. (Harrison Cert. ¶¶ 18, 24.)

In Count Two, she alleges that Defendant interfered with her rights under the Family Medical Leave Act ("FMLA") and otherwise discriminated against her for exercising her rights under the FMLA.

After Plaintiff received notification from OSHA in June 2014 that it was dismissing her complaint of retaliation, Plaintiff filed a motion in limine [Docket Item 24] to exclude the OSHA determination under Federal Rule of Evidence 403, arguing that its probative value is outweighed by its prejudicial effect and the risk that it would confuse the jury. Defendant opposed Plaintiff's motion.

Following discovery, Defendant filed a motion for summary judgment on all counts. [Docket Item 31.] Plaintiff opposed Defendant's motion and sought partial summary judgment [Docket Items 34 & 37], asking this Court to find as a matter of law that Defendant is not entitled to assert a "legitimate business reason" for Plaintiff's termination because her termination violates the contractual agreement between Defendant and Plaintiff's union.

## III. DISCUSSION

### A. Plaintiff's Motion to Exclude

Plaintiff moves for an order excluding the June 19, 2014 letter from OSHA finding no reasonable cause to believe that

19

Plaintiff was terminated in retaliation for filing an OSHA complaint. She first argues that the OSHA determination that Plaintiff was not retaliated against is inadmissible because the decision was based on a different standard of proof. She also argues the OSHA decision should be excluded because its probative value is outweighed by the risk of confusion and prejudice if it were to be admitted. Plaintiff argues that the letter would confuse a jury because it dismissed Plaintiff's claim of retaliation that was based on the filing of the OSHA complaint, but did not decide Plaintiff's claims of retaliation based on two other grounds raised in Plaintiff's Complaint, namely, that she was fired because she complained of an infestation of fruit flies in the bar area, and because she filed a union grievance for wage and hour violations. (Mot. to Exclude, at 8.) She argues that the OSHA letter would compromise a jury's ability to reach a legal conclusion because it makes a finding on the ultimate issue of retaliation. (Id. at 9.) Finally, she argues that the OSHA decision is not reliable evidence because OSHA failed to properly investigate Plaintiff's Complaint. (Id. at 10-11.)

Defendant acknowledges that there is an absence of case law directly addressing the admissibility of an OSHA finding in the context of civil litigation, but argues that reports of

governmental agencies charged with the legal duty of conducting investigations are presumed admissible. (Opp'n to Mot. to Exclude, at 6-7.) Defendant also argues that the report should be admissible because OSHA is not a party to the litigation and there is no evidence that the report lacks objectivity or trustworthiness. (Id. at 11-12.) Defendant argues that the probative value of the report is not substantially outweighed by unfair prejudice under Fed. R. Evid. 403. (Id. at 14-18.)

The Court will grant Plaintiff's motion to exclude the OSHA report. Under Rule 803(8)(B), a report or statement of a public office is admissible "if the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Thus, an investigative report by a governmental agency is admissible, even if it states a conclusion or opinion, "[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988). The Third Circuit, interpreting Beech Aircraft, has held that "public records are presumed admissible in the first instance and the party opposing the introduction bears the burden of coming forward with enough 'negative factors' to persuade a Court that the report should not be admitted." Complaint of Nautilus Motor Tanker Co., LTD.,

85 F.3d 105, 113 (3d Cir. 1996); see also Clark v. Clabaugh, 20 F.3d 1290, 1294-95 (3d Cir. 1994) (holding that under Fed. R. Evid. 803(8), report by Pennsylvania State Police is "presumed admissible," "including its opinions, conclusions and recommendations, unless the defendants demonstrate its untrustworthiness.").

Defendant cites to Beech Aircraft for the general proposition that fact-based conclusions and opinions in investigative reports written by governmental agencies are admissible. In Beech Aircraft, however, the report at issue was an exhaustive investigative report into a plane crash prepared by a Judge Advocate General, which included a detailed reconstruction of events leading up to the crash and was supported by some 60 attachments. 488 U.S. at 157-59. The Court emphasized that Rule 803(8) "bars the admission of statements not based on factual investigation," and found the report's conclusions admissible because they were based on a factual investigation, and because the report was sufficiently trustworthy to be admitted. Id. at 169. Similarly, in Nautilus Motor Tanker, the Third Circuit affirmed the admissibility of a report by the Coast Guard written after a Coast Guard investigation into an oil spill. Citing Beech Aircraft, the Third Circuit noted that statements in an investigative report

22

were admissible as long as two criteria were met: "First, all statements in such a report must be based on a factual investigation. . . . Second, any portion of the report that is admitted must be sufficiently trustworthy." 85 F.3d at 112. In that case, the Coast Guard had conducted a detailed investigation into the cause of the accident, whether there was evidence of any physical or design failure, and whether there was any evidence of willful misconduct, negligence, or willful violation of law, among other issues, and had issued a public report pursuant to federal regulations. Id. at 110.

By contrast, the OSHA letter in this case did not appear to have been based on any independent factual investigation. The "Secretary's Findings" are laid out in five paragraphs, and summarizes only Plaintiff's complaint of retaliation and Defendant's response to Plaintiff's complaint. The finding of non-retaliation appears to be based solely upon Defendant's claim that "the elimination of [Plaintiff's] position as a singing bartender was a legitimate business decision and had nothing to do with her protected activities." (OSHA Letter of Dismissal, Ex. G to Douglass Cert., Mot. to Exclude [Docket Item 24-11].) There is no indication in the letter that an OSHA investigator came to Resorts Casino or conducted witness interviews, nor is there anything in the record to suggest that

23

OSHA completed an independent investigation into Plaintiff's allegations or engaged in any sort of fact-finding. Rather, the OSHA letter appeared to have relied upon and adopted the conclusions of Harrison, an employee for the casino tasked with responding to OSHA complaints. Although the letter states that "Respondent has demonstrated by a preponderance of the evidence that Complainant's protected activities were not the motivating factor in the termination," it does not explain how it arrived at that decision, nor why Defendant's assertions of non-retaliation were entitled to more weight. Unlike the detailed factual reports discussed in Beech Aircraft and Nautilus Motor Tanker, the two-page letter by OSHA is not the product of a factual investigation, nor does it appear to be sufficiently trustworthy.

Defendant cites to Clark v. Clabaugh, 20 F.3d 1290 (3d Cir. 1994) for support for the proposition that an investigative report may be admissible even if all possible witnesses were not interviewed. But in that case, which involved the admissibility of a Pennsylvania State Police report, the court specifically noted that the investigating officers had "interviewed representatives from all factions involved" in the incident, and "appear thus to have achieved some measure of balance between opposing perspectives." 20 F.3d at 1295. The OSHA investigator

24

in this case conducted no interviews at all, and relied solely on the conclusions submitted by an employee of the Defendant to dismiss Plaintiff's claim of retaliation.  For similar reasons, the Court does not find Defendant's citation to Smith v. Universal Servs., Inc., 454 F.2d 154 (5th Cir. 1972), persuasive, as the EEOC investigation at issue in that case reached a conclusion on whether the employer had engaged in unlawful discrimination after interviewing different witnesses, weighing the credibility of each witness, and making specific findings of fact. 454 F.2d at 157.

The Court also finds that the OSHA letter is properly excluded under Fed. R. Evid. 403.[5] Coleman v. Home Depot, Inc., 306 F.3d 1333, 1344-45 (3d Cir. 2002). The letter rejects Plaintiff's allegations and adopts Defendant's position without any explanation of the basis for doing so and makes findings

---

[5] Federal Rule of Evidence 403 provides that relevant admissible evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to exclude relevant evidence is at the sound discretion of the trial court, and must be determined on a case-by-case basis. Coleman v. Home Depot, Inc., 306 F.3d 1333, 1345 (3d Cir. 2002); Paolitto v. John Brown E & C., Inc. 151 F.3d 60, 65 (2d Cir. 1998) (noting that "[m]ost circuits that have considered the issue have left the question of whether to admit EEOC or state-agency findings to the sound discretion of the district court" and citing cases); Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990).

that are within the exclusive domain of the jury. For example, the OSHA letter makes a determination that Plaintiff's protected activities "were not the motivating factor in the termination and absent the protected activities[,] [Defendant] would have taken the same adverse action." See McClain v. Pfizer Inc., No. 06-1795, 2010 WL 746777, at *2 (D. Conn. Mar. 1, 2010) (excluding OSHA's final decision on plaintiff's "whistleblower" complaint in part because it reached conclusions about plaintiff's motivations, conclusions that were within the exclusive domain of the jury); Earle M. Jorgensen Co. v. T.I.U.S. Ltd., No. 90-2024, 1992 WL 331466, at *1 (E.D. Pa. Nov. 3, 1992) (precluding expert testimony because "the conclusions of law invade the province of the court and the applications of law to facts invade the province of the jury"). Moreover, because the OSHA letter concerned only whether Defendant retaliated against Plaintiff for filing an OSHA complaint, there is the risk that a jury would apply OSHA's finding to Plaintiff's other claims of retaliation as well. The Court has already explained that the probative value of the OSHA letter is low, and its low probative value is substantially outweighed by the risk of unfair prejudice and confusion.

For the reasons stated above, the Court will grant Plaintiff's motion to exclude the June 19, 2014 OSHA letter.

26

**B. Plaintiff's Partial Motion for Summary Judgment**

After filing her opposition and cross motion for summary judgment, Plaintiff filed a motion to amend her brief on the same day [Docket Item 37], explaining that her earlier filing erroneously contained a draft version of her brief. The Court will grant Plaintiff's motion to amend and accepts Plaintiff's proposed amended brief, filed under Docket Item 37-2.

Defendant argues that Plaintiff's cross motion for summary judgment should not be considered because it is untimely. Pursuant to the July 18, 2014 Amended Scheduling Order, dispositive motions were due no later than January 30, 2015. Plaintiff filed a timely opposition to Defendant's motion for summary judgment on March 26, 2015, together with cross-motion for partial summary judgment. [Docket Item 37.]

Plaintiff's cross motion is not untimely. Local Rule 7.1(h) permits a party to file a cross motion ". . . related to the subject matter of the original motion . . . together with that party's opposition papers . . . ." L. Civ. R. 7.1(h); Davis v. Twp. of Paulsboro, 371 F. Supp. 2d 611, 617 (D.N.J. 2005). Under Rule 7.1(h), the cross motion was permitted to be filed on the date the opposition was due since the cross motion pertains to the same subject matter of the original motion. Petinga v. Sears, Roebuck and Co., No. 05-5166, 2009 WL 1622803, at *4 n.5

(D.N.J. June 9, 2009); Briglia v. Horizon Healthcare Services, Inc., No. 03-6033, 2007 WL 1959249, at *2 (D.N.J. July 3, 2007); In re CVEO Corp., 327 B.R. 210, 213 (Bankr. D. Del. 2005). As the Court also discerns no prejudice from Plaintiff's untimely motion, it will consider Plaintiff's cross motion on the merits.

     1. Standard of Review

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. <u>Boyle v. Cnty. of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252).

The standard by which the Court decides a summary judgment motion does not change when, as here, the parties file cross-motions. <u>See</u> <u>In re Cooper</u>, 542 F. Supp. 2d 382, 385–86 (D.N.J. 2008). When ruling on cross-motions for summary judgment, the court must consider the motions independently, <u>Williams v. Philadelphia House Auth.</u>, 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. <u>See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

2. <u>Plaintiff's motion for partial summary judgment will be denied.</u>

Resolution of Plaintiff's motion for partial summary judgment is necessary before considering the claims in this case, and the Court will address it first. Defendant argues that Plaintiff was terminated as a "singing bartender" because the position was being eliminated as part of Resort Casino's

strategic rebranding. Plaintiff urges the Court to find on summary judgment that Defendant cannot assert this rationale as a legitimate, nondiscriminatory reason, because the elimination of Plaintiff's position violated the Side Agreement to the CBA. (Pl. Opp'n and Mot. for Partial Summ. J. [Docket Item 37], at 11-13.)

The Court will deny Plaintiff's motion for several reasons. First, the Court notes that Plaintiff has not carried her burden of showing that Defendant's actions violated the CBA as a matter of law. Plaintiff asks this Court to interpret the Side Agreement to the CBA regarding the "singing bartender" position as an independently enforceable contract. She also asks this Court to interpret the language in the Side Agreement, that Plaintiff "shall remain in [the 'singing bartender' bid]" and that the "agreement shall expire upon Blanche's separation from the company," to mean that Plaintiff could not be terminated from her job unless she voluntarily left. However, Article 3 of the CBA explicitly gives Defendant the right to "recruit, hire, reclassify, retain, schedule, assign, promote, transfer, layoff/recall, discipline, discharge, or rehire according to the requirements of business . . . ." (CBA, Art. 3, Ex. 7 to Morro Cert. [Docket Item 34-7].)

The Court disagrees that Article 3 of the CBA should be

30

given no effect. "[A] contract should be read so as to give meaning to all of its terms when read as an entirety." Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 169 (3d Cir. 1987); J.L. Davis & Associates v. Heidler, 622 A.2d 923, 926 (N.J. Super. Ct. App. Div. 1993) ("Effect, if possible, will be given to all parts of the instrument and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable."). Here, Article 3 specifically allows Defendant to terminate a position "according to the requirements of business," and Plaintiff has not shown that the provisions in the Side Agreement were not meant to be read along with the rest of the CBA. Cf. Tessmar v. Grosner, 128 A.2d 467, 471 (1957) ("An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose.").[6]

---

[6] The Court further notes that the Article 5.1 of the CBA requires that disputes involving questions of interpretation or application of any clause of the CBA "shall be resolved by the utilization" of the grievance method specified within Article 5. Specifically, "[n]on-disciplinary grievances must be filed within thirty (30) calendar days of the event giving rise to the grievance or from the date of Union knowledge of that event whichever is later." (CBA, Art. 5.1(b).) If Plaintiff believed the elimination of the "singing bartender" position violated the terms of the CBA, her remedy was to grieve the elimination through the procedure specified in Article 5, which she failed

Moreover, no reasonable jury could find that the Side Agreement precluded Plaintiff from being fired. Plaintiff argues that the Side Agreement prohibited Defendant from terminating her while her job performance was satisfactory, and that Defendant had no discretion to eliminate her position for a business reason. (Pl. Opp'n and Mot. for Partial Summ. J., at 12.) The Court does not agree.

The New Jersey Supreme Court has noted that contracts for permanent employment are "at variance with general usage and sound policy," because such contracts are, "in practical effect, unilateral undertakings by the employer to provide a job for so long as the employee wishes to continue in it . . . ." The burden of performance in such a situation is unequal because "the employer is bound to the terms of the contract whereas the employee is free to terminate it at will." Savarese v. Pyrene Mfg. Co., 89 A.2d 237, 240 (N.J. 1952); see also Alter v. Resorts Intern., Inc., 560 A.2d 1290, 1292-93 (N.J. Super. Ct., Chanc. Div. 1989). Contracts for lifetime employment are not upheld in New Jersey except where "it most convincingly appears it was the intent of the parties to enter into such long range commitments and they must be clearly, specifically and definitely expressed." Id. at 240; see also Shebar v. Sanjo Bus.

---

to do.

Sys. Corp., 544 A.2d 377, 382 (N.J. 1988) (noting that contracts for lifetime employment were "extraordinary, and would be enforced only in the face of clear and convincing proof of a precise agreement setting forth all of the terms of the employment relationship."). Additional consideration must also be provided, or the relationship amounts to nothing more than employment at will. Savarese, 89 A.2d at 239-40 ("Where the employee has given consideration additional to the services incident to the employment, . . . the contract for permanent employment, for life employment, or for other terms purporting permanent employment, is valid and enforceable . . . ."); Scudder v. Media Gen., Inc., No. 95-1073, 1995 WL 495945, at *3 (D.N.J. Aug. 15, 1995) (stating same).

Plaintiff's interpretation of the Side Agreement would amount to a lifetime contract of employment. However, Plaintiff has failed to show that any additional consideration was provided for such a promise, as New Jersey law requires. Moreover, nothing in the Side Agreement indicates a clear intention to enter into such a long range commitment. On the contrary, Article 3 of the CBA, read in conjunction with the Side Agreement, clearly sets forth Defendant's right to reclassify, transfer, layoff, and discharge employees "according to the requirements of business."

33

Finally, whether or not Plaintiff's termination was illegal under the CBA is irrelevant to the question of whether Defendant's reason for firing her was a legitimate, nondiscriminatory one. To discredit the defendant's reasons, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken," since the factual dispute at issue is not whether the employer was competent, but whether retaliatory or discriminatory animus motivated the adverse decision. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994); Walker v. Sec. of the Air Force, 7 F. Supp. 3d 438, 459 (D.N.J. 2014). Even assuming Defendant's actions violated the Side Agreement, it does not automatically follow that Defendant acted with the sort of illegal animus prohibited by the FMLA or CEPA. Plaintiff has cited to no legal authority, and the Court finds none, to support her claim that a termination in violation of the CBA precludes an employer from asserting a legitimate, nondiscriminatory reason for the firing.

For the reasons stated above, the Court will deny Plaintiff's motion for partial summary judgment.

**C. Defendant's Motion for Summary Judgment**

    1. The FMLA Claims

Plaintiff claims that the elimination of her "singing bartender" position while she was out on protected leave

34

constituted both interference and retaliation under the FMLA. Defendant moves for summary judgment on both claims.

The Family Medical Leave Act allows "employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2). FMLA-eligible employees are allowed to take twelve weeks of leave during any twelve-month period, if an employee has a "serious health condition that makes the employee unable to perform the functions" of his or her job. Id. § 2612(a)(1)(D). Following this period of leave, an employee is entitled to be restored to his or her original position or its equivalent. Id. § 2614(a)(1).

An employer may be sued under the FMLA for interfering with an employee's FMLA rights, as well as for retaliating against an employee who exercises rights under the FMLA. Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 317 (3d Cir. 2014). "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009). The Court will address each claim in turn.

     a.   *Retaliation*

The FMLA prohibits employers from discriminating against employees who have taken FMLA leave, and also prohibits them

from using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, and disciplinary actions. 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c); see also Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159-60 (3d Cir. 1998). To establish a claim of discrimination (also known as retaliation) under the FMLA, a plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's FMLA leave. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004).

Once a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). The burden then shifts back to the plaintiff, who must show that the employer's proffered explanation was pretext and that the employer's real reason for retaliating against her was because she took FMLA-protected leave. Hodgens, 144 F.3d at 161; Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 532 (D.N.J. 2008).

36

In this case, there is no serious dispute that Plaintiff has established a prima facie case of discrimination. It is clear from the record that Morro had availed herself of the FMLA's leave provisions because she had sought and received approval for FMLA leave from her employer, and that the elimination of the "singing bartender" position constituted an adverse employment action. Additionally, the fact that Plaintiff was terminated from her position while she was still out on approved FMLA leave suggests a causal connection between the taking of leave and her demotion. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998) (stating that close temporal proximity between two events may give rise to inference of causal connection).

Defendant contends that there was a legitimate, nondiscriminatory reason for demoting Plaintiff to a regular bartender: Resorts Casino was undergoing an overhaul of its entertainment options as part of a strategic rebranding, and the "singing bartender" position was eliminated when 25 Hours Bar was renovated and renamed Bar One. Tindall asserts that the strategic rebranding and the overhaul of the 25 Hours Bar began in October 2012 and continued into the spring and summer of 2013, at the same time Plaintiff's position was eliminated. Disc jockeys were added to the bar's entertainment in March 2013; the

bar's name changed to Bar One in July; and live band
entertainment was eliminated in August 2013. The fact that the
"singing bartender" position was cut in June 2013 is consistent
with the timeline during which these changes were taking place.
Tindall further notes that Morro's termination was part of a
larger pattern, as other acts were also being eliminated around
the same time as part of the rebranding.  Moreover, Defendant did
not reinstate or replace the "singing bartender" position after
eliminating it, which strongly suggests that Defendant's
decision to terminate Plaintiff was a business decision, and was
not motivated by the fact that Plaintiff took protected leave
under the FMLA.

Plaintiff cannot dispute that these changes were taking
place. Indeed, Plaintiff admits that she knew about Defendant's
plans to change the look of the bar and that she was concerned
about the security of her job while these changes were being
discussed.

Defendant has demonstrated a legitimate, nondiscriminatory
reason for the elimination of the "singing bartender" position,[7]
and the Court now turns to the question of whether Defendant's

---

[7] As the Court has already explained, Defendant is not precluded
from asserting a legitimate, nondiscriminatory reason for the
termination merely because the termination may have violated the
Side Agreement to the CBA.

proffered reason was pretext for retaliation. To show pretext, Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reason; or (2) believe that retaliatory animus was more likely than not a motivating or determinative cause of the employer's conduct. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).

Plaintiff first urges the Court to hold as a matter of law that Defendant's decision to cut the "singing bartender" position was unlawful under the Side Agreement to CBA. As already explained above, however, it is doubtful that Defendant's actions violated the CBA, and even if it did, the fact that Defendant made a wrong decision does not by itself suggest that Defendant's reason was pretext for retaliation. Fuentes, 32 F.3d at 765.

Plaintiff next argues that Defendant's rationale is suspect, because Defendant continued to advertise and promote Plaintiff as the singing bartender on its website until March 2013, and she was assured by several managers at Resorts Casino that she was doing a fine job. Plaintiff essentially claims that the termination of the singing bartender position came as a

39

surprise because she was not told that the position was at risk for being eliminated. Even viewing the evidence in the light most favorable to Plaintiff, these facts are insufficient to raise an inference of pretext. No reasonable juror could find that Defendant's failure to keep Plaintiff informed of its ongoing business decisions that repurposed Plaintiff's entire department suggests that the Defendants' decision was retaliatory.

Nor does Plaintiff point to anything in the record which would suggest that Defendant was motivated by a retaliatory animus. Nothing in the record indicates that Defendant had a problem with Plaintiff taking FMLA leave, or with the fact that Plaintiff was unable to fulfill her singing obligations while she was out on leave. Indeed, after Plaintiff informed Defendant that she would be taking a day of FMLA leave on April 27th because of an allergic reaction, one manager wrote back, "Sorry to hear this. Barb just sent an eMail. I bet it's the carpet." Plaintiff did not return to work after that, and was granted FMLA leave from April 26th through June 4, 2013 with no difficulties. Defendant continued to allow Plaintiff to take leave for medical reasons for approximately a full year following her FMLA leave.

Because no reasonable trier of fact could conclude from the

40

record that Defendant fired Plaintiff for taking FMLA leave, the Court will grant summary judgment in favor of Defendant.

b.   *Interference*[8]

29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. "Interference" includes "[a]ny violations of the [FMLA] or of these [FMLA] regulations." 29 C.F.R. § 825.220(b). An interference claim under § 2615(a)(1) is "not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison v. City of Philadelphia, 430 F.3d 117, 120 (3d Cir. 2005). To prevail on an FMLA interference claim, an employee need only show that (1) she was entitled to benefits under the FMLA; and (2) she was denied them. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 312 (3d Cir. 2012); Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006). The interference inquiry is merely about whether the employer provided its employee with the entitlements and protections guaranteed by the FMLA. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (3d Cir. 1998).

---

[8] Plaintiff does not make a separate argument with respect to the interference claim in her brief.

An employee is entitled under to the FMLA to return from qualified leave to his or her former position, or to an equivalent one. Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004). However, this entitlement to restoration is a qualified one. The FMLA states that it does not entitle a restored employee to a right, benefit or position to which the employee would not "have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). When an employer can show that "an employee would have been laid off during the FMLA leave period" independent of the employee's leave, the employee will not be entitled to restoration. 29 C.F.R. § 825.216(a)(1); see also Conshenti, 364 F.3d at 141; Wolpert v. Abbott Laboratories, 817 F. Supp. 2d 424, 438 (D.N.J. 2011).

The employee bears the initial burden of showing that she was denied benefits under the FMLA. The burden then shifts to the employer to show there was no position available or that it offered the employee an equivalent position which the employee declined. Michniewicz v. Metasource, LLC, 756 F. Supp. 2d 657, 666 (E.D. Pa. 2010); Spagnoli v. Brown & Brown Metro, Inc., No. 06-414, 2007 WL 2362602, at *11 (D.N.J. Aug. 15, 2007).

The Court finds that summary judgment in favor of Defendant is appropriate. First, Plaintiff has not shown that she was

42

denied any benefit under the FMLA, because she failed to return to work after she exhausted her 12 weeks of leave under the FMLA. While an employer may not terminate an employee because he or she has taken leave permitted by statute, an employer does not violate the FMLA if it terminates an employee during the twelve weeks of approved leave and the employee would not have been able to return to work at the end of the twelve weeks. Katekovich v. Team Rent a Car of Pittsburgh, Inc., 36 Fed. App'x 688, 691 (3d Cir. 2002) (citing Cehrs v. Northeast Ohio Alzheimer's Research Ctr., 155 F.3d 775, 784-85 (6th Cir. 1998)).

Plaintiff took FMLA leave in April of 2013 and remained on leave continuously until August 2014. Although her position was eliminated in June 2013, nothing in the record supports that she would have been able to return to work in July, once her twelve weeks of FMLA leave were exhausted. Nor does Plaintiff argue otherwise. See Katekovich, 36 Fed. App'x at 691 (affirming grant of summary judgment on FMLA claim because plaintiff did not present sufficient evidence to support a finding that she could have returned to work within twelve weeks).

Moreover, even if Plaintiff had been able to return to work in July of 2013, no reasonable jury could find that Defendant had a "singing bartender" position or its equivalent available

at that time. "The FMLA does not absolutely protect an
employee's reinstatement." Parker v. Hahnemann Univ. Hosp., 234
F. Supp. 2d 478, 485-86 (D.N.J. 2002) (Simandle, J.). Defendant
had eliminated the position permanently and had transformed the
entertainment options at Bar One while Plaintiff was on leave.
Defendant did not hire anyone else for the position after
Plaintiff stopped working because the position was gone, and
nothing in the record suggests that there was an equivalent
position to which Plaintiff could have been reinstated.

Finally, Defendant has also demonstrated that Plaintiff's
termination was a business decision, unrelated to Plaintiff's
exercise of FMLA rights. See Lichtenstein, 691 F.3d at 312
(stating that employer may defeat employee's claim of
interference "if it can demonstrate that [the employee] was
terminated for reasons 'unrelated to' her exercise of [FMLA]
rights (quoting Sarnowski v. Air Brooke Limousine, Inc., 510
F.3d 398, 403 (3d Cir. 2007)); Conshenti, 364 F.3d at 141
(noting that there is no right to reinstatement under the FMLA
if the adverse employment decision occurs for a reason unrelated
to the leave). As already discussed above, no reasonable juror
could find that Defendant's decision was pretext.

For these reasons, summary judgment will be granted in
favor of Defendant, and Plaintiff's claim of interference will

44

be dismissed.

2. The CEPA Claims

The New Jersey Conscientious Employee Protection Act ("CEPA"), commonly known as the "whistle-blower" statute, prohibits employers from taking retaliatory action against an employee who (1) discloses or threaten to disclose to a supervisor or public body an employer's wrongful activity or policy, (2) provides information to or testifies before a public body conducting an investigation into any violation of law, or (3) objects to or refuses to participate in an activity or practice which the employee reasonably believes is in violation of law or is incompatible with a clear mandate of public policy. See N.J.S.A. 34:19-3. The purpose of CEPA is "to protect employees who report illegal or unethical work-place activities," and the New Jersey Supreme Court has held that courts should construe CEPA liberally in order "to achieve its remedial purpose." Roach v. TRW, Inc., 754 A.2d 550 (N.J. 2000) (quoting Barratt v. Cushman & Wakefield, 675 A.2d 1094, 1098 (N.J. 1996)).

The court conducts a three-step analysis in analyzing a claim made under CEPA. First, the court must determine if the plaintiff has established a prima facie case of retaliatory discharge under CEPA. See Blackburn v. United States, 179 F.3d

45

81, 92 (3d Cir. 1999). CEPA requires a plaintiff to prove four elements for a successful claim: (1) that the plaintiff reasonably believed that the employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 468 (D.N.J. 2009) (citing Kolb v. Burns, 727 A.2d 525, 530 (N.J. Super Ct. App. Div. 1999)).

Once plaintiff has established a prima facie case, the burden shifts to defendant to articulate some legitimate nondiscriminatory reason for making the adverse employment decision. See Blackburn, 179 F.3d at 92 (citing Kolb, 727 A.2d at 530-31). The burden shifts back to the plaintiff, who, in order to survive summary judgment, must raise an issue of fact that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer. See id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

Plaintiff alleges three separate CEPA violations, and the Court will address each in turn.

    a.   *Plaintiff's Worker's Compensation Claim*

46

Plaintiff first claims that Defendant violated CEPA by retaliating against Plaintiff for filing a claim for worker's compensation. To establish a prima facie case of retaliatory discharge, Plaintiff must first show that she reasonably believed that Defendant's conduct violated a rule or law or regulation promulgated pursuant to law. In order to be considered protected activity under CEPA, however, "the complained of activity must have public ramifications, and . . . the dispute between employer and employee must be more than a private disagreement." Maw v. Advanced Clinical Commc'ns, Inc., 846 A.2d 604, 608 (N.J. 2004). In other words, "the offensive activity must pose a threat of public harm, not merely private harm only to the aggrieved employee." Melman v. Mobil Oil Corp., 707 A.2d 1000, 1013 (N.J. 1998); see also Dzwonar v. McDevitt, 828 A.2d 893, 901 (N.J. 2003) (noting that goal of CEPA is "not to make lawyers out of conscientious employees" but rather to prevent retaliation against employees who object to conduct "they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.") (internal quotations and citation omitted).

The Court will dismiss Plaintiff's claim because the filing of a worker's compensation claim does not fall within the statutory protections of CEPA. A worker's compensation claim

47

involves a claim for benefits and compensation for an on-the-job injury. Such a claim "is more akin to a private dispute than an attempt to publicly expose unlawful conduct by an employer," and does not constitute protected whistleblowing activity under CEPA. Davis v. Supervalu, Inc., No. 13-414 2013 WL 1704295, at *3 (D.N.J. Apr. 19, 2013) (Simandle, J.); see also Hester v. Parker, 2011 WL 1404886, at * 6 (Apr. 14, 2011) ("[T]he simple filing of a complaint seeking back wages or a workers' compensation claim cannot be considered a 'whistle-blowing activity.'").

Plaintiff's claim must also be dismissed for the simple reason that she did not file a worker's compensation claim until October 2013, five months *after* her position as a "singing bartender" was eliminated on June 1, 2013. Although Plaintiff sought Defendant's approval for temporary disability benefits in the spring of 2013, nothing in the record suggests that she took steps to file for worker's compensation, or that Defendant knew she would be filing for worker's compensation, before June 1, 2013. In fact, on the form she submitted to Defendant for disability benefits, Plaintiff had answered "No" to the question, "Did the claimant's disability happen in connection with his/her work or while on your premises, or was the disability due in any way to his/her occupation?" (Id.)

48

Plaintiff therefore cannot show a causal connection between her protected activity and the adverse action.[9] See <u>Robles v. U.S. Environmental Universal Servs., Inc.</u>, 469 Fed. App'x 104, 108 (3d Cir. 2012) (dismissing CEPA claim on summary judgment because plaintiff did not complain to Department of Labor until after his termination, and there was no evidence that his statements to employer that he would be filing a complaint caused his discharge).

The Court will accordingly grant summary judgment in Defendant's favor on the alleged CEPA violation based on the filing of a worker's compensation claim.

> b.    *Plaintiff's Union Grievance*

Plaintiff next claims that Defendant eliminated her position

---

[9] Nor may Plaintiff succeed by arguing that Defendant retaliated against her by failing to reinstate her to her original position after she indicated her ability to return to work in August 2014. The "singing bartender" position was eliminated in 2013, and nothing in the record suggests that an equivalent position was even available when Plaintiff returned to work. Nor is there anything in the record that would suggest a causal connection between the filing of her worker's compensation claim and Defendant's refusal to reinstate her as a "singing bartender" ten months later. See <u>Smith v. Twp. of E. Greenwich</u>, 344 F. App'x 740, 749 (3d Cir. 2009) (whistle-blowing occurring sometime between July and October 2004 and failure to promote sometime in 2005 insufficient to raise inference of causation); <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 233 (3d Cir. 2007) (without more, a three month gap between adverse employment action and protected activity is insufficient to give rise to an inference of causation); <u>Andreoli v. Gates</u>, 482 F.3d 641, 650 (3d Cir. 2007) (five month gap insufficient to give rise to an inference of causation).

because she filed a union grievance seeking back pay in accordance with the hourly wage set forth in the Side Agreement. Defendant argues that Plaintiff's belief that Resorts Casino violated the law was not objectively reasonable, and thus Plaintiff's CEPA claim must fail.

Although CEPA does not require a plaintiff to know, to a legal certitude, the precise contours or components of the law that has purportedly been violated, the plaintiff must reasonably believe that Defendant's actions were unlawful. "Of course, if [plaintiff's] belief, however sincere, was objectively unreasonable, [her] actions are not protected activity and [her] CEPA claim must fail." Young v. Prudential, 588 A.2d 1069, 1081 (N.J. Super. Ct. App. Div. 1997); Blackburn v. United Parcel Serv., Inc., 3 F. Supp. 2d 504, 515 (D.N.J. 1998).

Viewing the evidence in the light most favorable to Plaintiff, and extending to Plaintiff all reasonable inferences, the Court finds that Plaintiff has raised a genuine issue of fact whether her belief was objectively reasonable. The Side Agreement setting her hourly wage at $22.61 was part of the CBA, which had already been finalized by Defendant and the union. Although Defendant told Plaintiff that the amount was a typo, a rationale factfinder could find that Plaintiff reasonably believed that the wage specified in the MOU was accurate, since

50

it was part of the CBA, which had been negotiated and approved by her employer.

Nevertheless, the Court finds that summary judgment is warranted in Defendant's favor. As with the worker's compensation claim, Plaintiff's filing of a union grievance involved a private disagreement between Plaintiff and her employer regarding her correct hourly wage. Defendant's conduct did not pose a threat of public harm, nor was Plaintiff complaining of a violation of clearly mandated workplace standards. Rather, the purpose of the union grievance was to rectify a private harm to Plaintiff herself. As such, Plaintiff's union grievance does not constitute protected activity under CEPA. See Maw, 846 A.2d at 608 (noting that "complained of activity must have public ramifications"); Hester, 2011 WL 1404886, at *6 (declining to hold that "every employee who invokes an established dispute resolution procedure, such as a contractual grievance procedure, . . . and is thereafter terminated has a CEPA cause of action," because "[a]n employee who invokes the powerful remedial forces of CEPA must also engage in whistle-blowing activities."); Madera v. Horizon Blue Cross Blue Shield of N.J., 2011 WL 1530980, at *6 (N.J. Super. Ct. App. Div. 2011) (holding that plaintiff's complaint that employer asked her to alter an internal report

was not whistleblowing activity because there was an "absence of public ramifications"); see also Smith v. Travelers Mortg. Servs., 699 F. Supp. 1080, 1083 (D.N.J. 1988) (agreeing with defendants that the filing of an EEOC claim does not fall within the protections of CEPA because CEPA protects activities such as testifying or reporting about such harms as public health violations).

Finally, as already discussed in Section III.C.1, Defendant has set forth a legitimate, nondiscriminatory reason for terminating Plaintiff's position, which Plaintiff cannot rebut. Nothing in the record suggests that Defendant's articulated rationale is suspect, nor could a reasonable juror find that the adverse action was motivated in part by the fact that Plaintiff filed a union grievance.

Accordingly, the Court will grant summary judgment and dismiss Plaintiff's CEPA claim based on the filing of a union grievance.

> c.   *Plaintiff's OSHA Complaint*

Finally, Plaintiff argues that Defendant terminated her position as a "singing bartender" because Plaintiff filed a complaint with OSHA. The Court will dismiss Plaintiff's claim, because no reasonable jury could find on the evidence that Defendant knew that Plaintiff was the OSHA complainant when it

52

ended her position. First, Plaintiff stated at deposition that she did not send copies of her OSHA correspondence to Defendant until after she was fired. Moreover, Frank Harrison, who was responsible for receiving and responding to OSHA complaints, certified that he did not know the identity of the individual who filed the OSHA complaint until June 17, 2013, when he received a copy of Plaintiff's correspondence to OSHA, more than two weeks after Plaintiff had already been terminated from her position.  His email to George Wackenheim on that day, informing Wackenheim that "[r]ecently there was an OSHA complaint filed by an unknown employee," that he had just received a copy of a letter between Plaintiff and OSHA, and that "[w]e did not know she filed an OSHA complaint so her accusations are unfounded," further demonstrates that Defendant was unaware of the identity of the OSHA complainant until weeks after Plaintiff had already been terminated. Finally, Mary Tindall, the individual responsible for overseeing and approving entertainment acts at Resorts, asserts that she was not aware of Plaintiff's OSHA complaint before Plaintiff was terminated.

Plaintiff argues that it would have been obvious to Defendant that Plaintiff was the person who called OSHA because Plaintiff had been "regularly complaining" to management for months about the same conditions that OSHA was investigating.

However, Plaintiff admits that Harrison never spoke to her during his investigation and was not aware of her complaints or the medical issues she developed from the construction. (See Counter SMF ¶ 160.) Even though Plaintiff told her supervisors that she wanted to "go outside Resorts for relief" to address the unsafe workplace conditions, there is no evidence that Defendants interpreted that vague statement to mean that Plaintiff would be filing a complaint with OSHA. Moreover, Plaintiff also admits that both guests and other coworkers had complained about the dust and construction debris, which undermines her argument that it would have been obvious to Defendant that Plaintiff was the one who filed the OSHA complaint. (Morro Cert. ¶ 161.) In light of the evidence, no reasonable juror could conclude that Defendant knew at the time it eliminated the "singing bartender" position that Plaintiff had filed an OSHA complaint.

Plaintiff's claim must also be dismissed because she has not satisfied her burden of showing that Defendant's articulated nondiscriminatory reason for her termination – a rebranding of the 25 Hours Bar and overhaul of its entertainment – was pretext. As already discussed, Plaintiff has not raised a genuine factual dispute over whether Defendant's articulated reason was suspect. Nor is there anything in the record from

54

which a reasonable jury could find a pattern of antagonism to suggest retaliatory animus for filing an OSHA complaint.

As Plaintiff cannot establish on the evidence that the termination of her position was caused by the filing of her OSHA complaint, the Court will grant summary judgment in Defendant's favor.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's motion to exclude the OSHA letter. Plaintiff's motion to amend her brief in opposition and in support of a motion for partial summary judgment will be granted, and Plaintiff's motion for partial summary judgment will be denied. The Court will grant Defendant's motion for summary judgment. The accompanying Order will be entered.


__June 30, 2015__                    __s/ Jerome B. Simandle__
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge

55